IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| FIRST AMERICAN BANK, et al., | ) | |
| | ) | Case No. 14 C 8120 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | Honorable John Robert Blakey |
| RBS CITIZENS, N.A., | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM OPINION AND ORDER

Plaintiff First American Bank (individually and as subrogee of First Aid Corporation d/b/a 1st Ayd Corporation), filed a Second Amended Complaint [48] against defendants Federal Reserve Bank of Atlanta, RBS Citizens, N.A. d/b/a Charter One (individually, "RBS Citizens" and collectively, the "bank defendants") and David Goodson, alleging breach of warranty under Regulation J, 12 C.F.R § 210.6 (Count I), implied indemnity against the bank defendants (Count II), restitution for payment by mistake under 810 ILCS 5/3-418 (Count III), negligent spoliation of evidence against RBS Citizens (Count IV) and professional negligence against Goodson (Count V). The defendants have moved to dismiss for failure to state a claim [52], [57]. For the reasons explained below, the motions are granted.

Background

Plaintiff filed this lawsuit "to recover for the defendants' participation in the transfer and collection of a fraudulent check in the amount of $486,750.33 and for professional negligence." Second Amended Complaint ("SAC") [48], ¶1. Plaintiff,

along with Federal Insurance Company, filed an initial complaint on October 16, 2014 [1], and an amended complaint [6] on November 12, 2014.  On June 25, 2015, this Court dismissed the amended complaint as to the bank defendants [43].  Plaintiff then filed the SAC on August 3, 2015.  The bank defendants again moved to dismiss [52].  Goodson has also moved to dismiss [57].

In the SAC, Plaintiff alleges that defendant Goodson received an email from "Fumiko Anderson" seeking his assistance in recovering funds purportedly owed pursuant to a divorce proceeding.  SAC [6], ¶17.  Goodson then received a check via UPS delivery from Ontario, Canada, in the amount of $86,176.96; the check was made payable to the "Law Office of David M. Goodson" and "drawn by" First Aid Corporation on its account at First American.  *Id.*, ¶¶18-19.  Goodson endorsed the check and deposited it in his client trust account at RBS Citizens.  *Id.*, ¶20.  He then "caused RBS Citizens to wire some or all of the funds . . . to Japan."  *Id.*, ¶22.  Plaintiff further alleges that RBS "took an electronic image of the check, transferred the image through the Federal Reserve System for payment by First American, and destroyed the original check."  *Id.*, ¶23.  The Complaint does not seek damages or make any claims with respect to this check.

Plaintiff further alleges in the SAC that Goodson received a second check in November 2013; this check too arrived via UPS from Ontario, Canada, was made payable to the "Law Office of David M. Goodson" and was drawn by First Aid Corporation on its account at First American.  SAC [48], ¶24.  As before, Goodson endorsed the second check and deposited it into his client trust account at RBS

Citizens; that same day, he caused RBS Citizens to wire some or all of the funds to Japan. *Id.*, ¶¶25, 27. Again, Plaintiff alleges, RBS Citizens took an electronic image of the check, transferred the image through the Federal Reserve System for payment by First American, and destroyed the original check. *Id.*, ¶26. This second check is designated No. 191435. *Id.*, ¶24.

Both checks were fraudulent, as the parties later learned. SAC [48], ¶6. As a result, First American re-credited First Aid Corporation's account for both amounts and then sought indemnity from RBS Citizens. *Id.*, ¶28-29. RBS Citizens indemnified First American for the first check, but not the second. *Id.*, ¶29. Pursuant to a policy of insurance, Federal Insurance Company "(FIC") indemnified First American for a portion of its losses with regard to check No. 191435, First American assigned FIC the right to pursue recovery of those losses and then FIC reassigned such rights back to First American. *Id.*, ¶30. As a result, First American is now the sole party in interest for the pursuit of the claims asserted in this action, and the SAC is filed on behalf of First American alone. *Id.*

First American sued RBS Citizens and the Federal Reserve Bank of Atlanta. According to the amended complaint, RBS Citizens transferred the item through the Federal Reserve System for payment by First American, and the Federal Reserve Bank of Atlanta was the immediate transferor of the item to First American. SAC [48], ¶7. First American also sued Goodson for his part in the transaction. The SAC asserts five claims: Count I asserts breach of warranty under Regulation J, 12 C.F.R. §210.6 against all defendants; Count II asserts an implied

indemnity claim against the bank defendants; Count III asserts restitution by mistake under 810 ILCS 5/3-418 against all defendants; Count IV asserts a claim of negligent spoliation of evidence against RBS Citizens; and Count V asserts a claim of professional negligence against Goodson. Plaintiff seeks judgment in its favor against the defendants, jointly and severally, in the amount of $486,750.33, plus interest, costs, attorneys' fees and expenses.

The bank defendants moved to dismiss Counts I, II, III and IV under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim for which relief may be granted. Goodson moved to dismiss Counts I, III and V, joining the bank defendants' motion as to Counts I and III.

<u>Discussion</u>

"To survive a motion to dismiss under Rule 12(b)(6), the complaint must provide enough factual information to 'state a claim to relief that is plausible on its face' and 'raise a right to relief above the speculative level.'" *Doe v. Village of Arlington Heights*, 782 F.3d 911, 914 (7th Cir. 2015)(quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

When analyzing a motion under Rule 12(b)(6), the Court must construe the allegations of the operative complaint in the light most favorable to the plaintiffs, accepting as true all well-pleaded facts and drawing all reasonable inferences in

their favor. *E.g., Yeftich v. Navistar, Inc.*, 722 F.3d 911, 915 (7th Cir. 2013)(citing Fed. R. Civ. P. 12(b)(6); *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008)). Additionally, Rule 12(b)(6) limits this Court's consideration to "allegations set forth in the complaint itself, documents that are attached to the complaint, documents that are central to the complaint and are referred to in it, and information that is properly subject to judicial notice." *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013).

A.    <u>Plaintiff's Claim for Breach of Warranty in Violation of Regulation J</u>

In Count I, Plaintiff alleges that defendants breached the warranty required in Regulation J that the electronic version of the check accurately reflected all of the information on the original check. The bank defendants argue in their motion that Count I should be dismissed because Plaintiff has failed to plead a plausible claim for breach of warranty in violation of Regulation J. Goodson joins the motion.

Just as it did with respect to the motion to dismiss the prior complaint, resolution of the current motions turns on the construction of the language of Regulation J. Applying basic rules of statutory construction, the Court begins with the language of the regulation itself. *E.g., U.S. v. Balint*, 201 F.3d 928, 932 (7th Cir. 2000)("When we interpret a statute, we look first to its language.") If the operative language is unambiguous when read within its context, the Court's job is simply to give those words their full force and effect. If the language is ambiguous or is otherwise reasonably subject to conflicting interpretation, then the Court's analysis is more complex.

Here, the Court's interpretation of Regulation J "is guided not just by a single sentence or sentence fragment, but by the language of the whole law, and its object and policy." *Balint*, 201 F.3d at 933 (citing *Grammatico v. United States*, 109 F.3d 1198, 1204 (7th Cir.1997)). The Federal Reserve Board's commentary is also instructive as to the meaning of a given word or phrase. *E.g., Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 566 (1980); *Fogle v. William Chevrolet/GEO, Inc.*, No. 99 C 5960, 2000 WL 1129983, at *3 (N.D. Ill. Aug. 9, 2000)("considerable respect is due 'the interpretation given [a] statute by the officers or agency charged with its administration.' An agency's construction of its own regulations has been regarded as especially due that respect.")(quoting *Zenith Radio Corp. v. United States*, 437 U.S. 443, 450 (1978); *Udall v. Tallman*, 380 U.S. 1, 16 (1965)). *See also U.S. v. Vizcarra*, 668 F.3d 516, 520 (7th Cir. 2012)(commentary in the guidelines manual that interprets or explains a guideline is authoritative unless it is inconsistent with, or a plainly erroneous reading of, that guideline); *U.S. v. Mitchell*, 353 F.3d 552, (7th Cir. 2003)(treating the USSC's commentary to the guideline as authoritative).

Regulation J consists of two subparts: Subpart A, which addresses the collection of checks and other items by Federal Reserve Banks; and Subpart B, which deals with Funds Transfers through Fedwire. For present purposes, only Subpart A is relevant, and particularly Section 210.6 of Subpart A, which addresses "[s]tatus, warranties, and liabilities of Reserve Bank." 12 C.F.R. §210.6. Under Regulation J, when a Reserve Bank presents or sends an item, it "warrants to a subsequent collecting bank and to the paying bank and any other payor that—

(i) The Reserve Bank is a person entitled to enforce the item (or is authorized to obtain payment of the item on behalf of a person that is either entitled to enforce the item or authorized to obtain payment on behalf of a person entitled to enforce the item);

(ii) The item has not been altered; and

(iii) The item bears all indorsements applied by parties that previously handled the item, in paper or electronic form, for forward collection or return. 12 C.F.R. §210.6(b).

Additionally, with respect to "electronic items," the "Reserve Bank makes all the warranties set forth in and subject to the terms of 4-207 of the [Uniform Commercial Code] for an electronic item as if it were an item subject to the U.C.C. and makes the warranties set forth in and subject to the terms of § 229.34(c) and (d) of this chapter for an electronic item as if it were a check subject to that section." 12 C.F.R. § 210.6 (b)(2).

For electronic items that are not representations of substitute checks, the following also applies:

(i) If the electronic item is not a representation of a substitute check, the Reserve Bank warrants to the bank to which it transfers or presents that item that—

(A) The electronic image portion of the item accurately represents all of the information on the front and back of the original check as of the time that the original check was truncated; the information portion of the item contains a record of all MICR–line information required for a substitute check under § 229.2(aaa) of this chapter; and the item conforms to the technical standards for an electronic item set forth in an operating circular; and

(B) No person will receive a transfer, presentment, or return of, or otherwise be charged for, the electronic item, the original item, or a paper or electronic representation of the original item such that the person will be asked to make payment based on an item it already has paid.

12 C.F.R. § 210.6 (b)(3).

Plaintiff alleges that check No. 191435 "contained certain physical characteristics, including 'MicroPrint' on signature lines, an 'Original Document' watermark, a 'Padlock' icon, and preprinted information describing security characteristics of the check stock," and that First American Bank personnel are trained to examine checks to "watch for signs of counterfeiting, such as irregularities in the physical characteristics" described above. SAC [48], ¶¶37, 39. Plaintiff further alleges that "the preprinted information describing security characteristics of the check stock should have survived imaging"; that RBS Citizens "created a poor image" of check No. 191435; and that, as a result, electronic check No. 191435 "did not accurately represent all of the information on the front and back of the original check as of the time the original check was truncated" and "did not accurately represent preprinted information describing security characteristics of the check stock." *Id.*, ¶¶40-41. Plaintiff further alleges that, if the original check rather than the electronic check had been presented, "First American would not have paid the check." *Id.*, ¶42. As such, Plaintiff alleges that its loss "was directly caused by the decision of [RBS Citizens], as agent for collection of Goodson, and the Atlanta Fed, as agent for collection of Goodson and sub-agent for collection of Goodson, to present an electronic image" of check No. 191435 "rather than the original." *Id.*, ¶43.

In its earlier complaint, Plaintiff also alleged that the electronic image portion of the second check did not accurately represent all of the information on

the front and back of the original check as of the time that the original check was truncated. Plaintiff alleged that the original check stock "contained certain security features on each check, including 'MicroPrint' on signature lines, an 'Original Document' watermark and a 'Padlock' icon"; and that the check presented "was a poor image" and "did not accurately represent all of the information on the front and back of the original check as of the time that the original check was truncated." Amended Complaint [6], ¶¶36-37.

Regulation J does not define what specific information falls within the phrase "all of the information on the front and back of the original check as of the time that the original check was truncated." Regulation J, however, instructs that unless "the context otherwise requires . . . [t]he terms not defined herein have the meanings set forth in §229.2 of this chapter applicable to subpart C or subpart D of part 229 of this chapter, as appropriate . . . ." 12 C.F.R. §210.2(s)(1). This language refers to Regulation CC, also promulgated by the Federal Reserve Board.

Regulation CC, in turn, implements the Expedited Funds Availability Act, which addresses the issue of delayed availability of funds by banks.[1] Along with its

_____

[1] The EFAA "requires banks to: (1) make funds deposited in transaction accounts available to their customers within specified time frames; (2) pay interest on interest-bearing transaction accounts not later than the day the bank receives credit; and (3) disclose their funds-availability policies to their customers." Board of Governors of the Federal Reserve System, Compliance Guide, Regulation CC (http://www.federalreserve.gov/bankinforeg/regcccg.htm). Regulation CC is divided into four subparts: Subpart A defines terms and outlines enforcement authority; Subpart B specifies schedules within which banks must make funds available for withdrawal, exceptions to the schedules, disclosure of funds-availability policies, and payment of interest; Subpart C contains rules to speed the collection and return of checks; and as noted above, Subpart D contains provisions that pertain to substitute checks. The Regulation also includes several appendices, including Appendix E to Part 229 – Commentary.

appendices, Subpart D of Regulation CC deals with substitute checks, and states in Section 229.51, entitled "General provisions governing substitute checks," that:

> [A] substitute check for which a bank has provided the warranties described in §229.52 is the legal equivalent of an original check for all persons and all purposes, including any provision of federal or state law, if the substitute check–
>
> (1) **Accurately represents all of the information on the front and back of the original check as of the time the original check was truncated**; and
>
> (2) Bears the legend, "This is a legal copy of your check. You can use it the same way you would use the original check."

12 C.F.R. §229.51 (emphasis added). Regulation CC uses the same language as Regulation J, but unlike Regulation J, Regulation CC also provides instructive commentary concerning what the phrase "all of the information" means in the context of a warranty concerning the accuracy of "all of the information on the front and back of the original check as of the time the original check was truncated." In particular, the commentary makes clear that the warranty does not require that the security features visible on the original check be included on the electronic item. By way of example, the Federal Reserve Board instructs as follows:

> 3. To be the legal equivalent of the original check, a substitute check must accurately represent all the information on the front and back of the check as of the time the original check was truncated. An accurate representation of information that was illegible on the original check would satisfy this requirement. The payment instructions placed on the check by, or as authorized by, the drawer, such as the amount of the check, the payee, and the drawer's signature, must be accurately represented, because that information is an essential element of a negotiable instrument. Other information that must be accurately represented includes (1) the information identifying the drawer and the paying bank that is preprinted on the check, including the MICR line; and (2) other information placed on

10

the check prior to the time an image of the check is captured, such as any required identification written on the front of the check and any indorsements applied to the back of the check. **A substitute check need not capture other characteristics of the check, such as watermarks, microprinting, or other physical security features that cannot survive the imaging process or decorative images, in order to meet the accuracy requirement. Conversely, some security features that are latent on the original check might become visible as a result of the check imaging process. For example, the original check might have a faint representation of the word "void" that will appear more clearly on a photocopied or electronic image of the check.** Provided the inclusion of the clearer version of the word on the image used to create a substitute check did not obscure the required information listed above, a substitute check that contained such information could be the legal equivalent of an original check under §229.51(a). However, if a person suffered a loss due to receipt of such a substitute check instead of the original check, that person could have an indemnity claim under §229.53 and, in the case of a consumer, an expedited recredit claim under §229.54.

12 C.F.R. Part 229, Appendix E, XXX(A)(3), §229.51(a)(emphasis added).

Based upon the plain language of Regulation J, as interpreted using the authoritative commentary from Regulation CC, the failure to include security features on an electronic check cannot give rise to a breach of warranty claim. Here, Plaintiff's Regulation J breach of warranty claim is predicated on the absence of visible security features on the electronic item, and the Court rejected this claim in connection with the earlier version of Plaintiff's complaint.

Nonetheless, Plaintiff argues that its claim is different this time because it has included an allegation that Plaintiff "believes that at least one, and potentially other, physical characteristics" of check No. 191435 as alleged in Paragraph 37 "would have survived the imaging" of the check. For example, the preprinted information describing security characteristics of the check stock should have

survived imaging." SAC [48], ¶40. Plaintiff made this same argument in opposition to defendants' motion to dismiss its previous Regulation J claim. Plaintiff previously argued that the box on the back of the check explaining the security features was illegible on the electronic image of the check. But, as the Court noted previously, Plaintiff did not allege that the security box, which was plainly illegible on the electronic item, was different on the original check. The SAC similarly does not allege that the security box was legible on the original item. Nor does the SAC allege that a visible but illegible security box in an effort to support a claim under Regulation J. There is no question that the security box is visible on the electronic item. Thus, Plaintiff still cannot show that the electronic item did not accurately represents all of the information on the front and back of the original check as of the time the original check was truncated.

Additionally, as the Court noted when it dismissed the earlier claim, "Regulation J is clear that the bank defendants may be liable only for their lack of good faith or their failure to exercise ordinary care." June 25, 2015 Memorandum Opinion and Order [43], p. 12 (citing C.F.R. §210.6 (b)(1)). Plaintiff still does not allege lack of good faith or any failure to exercise ordinary care on the part of the defendants with respect to its Regulation J breach of warranty claim. In fact, in response to the motion to dismiss, Plaintiff represents that RBS Citizens took steps to detect any fraud and then elected to destroy the original of the check "[f]or its own business convenience." Response [61], p. 3. Business convenience does not establish a lack of good faith, and the claim fails for this reason as well.

B.    Plaintiff's Implied Indemnity Claim

In Count II of the SAC, Plaintiff alleges an implied indemnity claim against the bank defendants.  Plaintiff alleges that it had a pre-existing relationship with the bank defendants and that, with respect to the fraudulent checks at issue here, there is "a qualitative distinction" between the conduct of First American and the conduct of the bank defendants.  SAC [48], ¶46-49.  On the one hand, RBS Citizens took "a large, highly unusual and suspicious check from Goodson for deposit"; wired funds to Japan before the check cleared; and destroyed the original check.  *Id.*, ¶49. And the Atlanta Fed presented the fraudulent item to Plaintiff for payment as requested by RBS Citizens.  *Id.*, ¶48(E).  Plaintiff, on the other hand, "never had the opportunity to review the original" of check No. 191435 and "reasonably believed that [RBS Citizens] had taken care to create a proper image of the check before transferring it for presentment."  *Id.*, ¶48(F).  Consequently, Plaintiff alleges, the bank defendants have a duty, implied at law, to indemnify Plaintiff for its losses caused by their presentment of electronic check No. 191435.  *Id.*, ¶50.

"Under Illinois law, implied indemnity is available to a principal who, through no fault of its own, is held liable for its agent's negligent tort against a third party." *Jordan v. Jewel Food Stores, Inc.*, 83 F. Supp. 3d 761, 772 (N.D. Ill. 2015)(quoting *BCS Insurance Company v. Guy Carpenter & Co.*, 490 F.3d 597, 603 (7th Cir. 2007)).  The ultimate purpose of indemnification is to shift the "entire responsibility from the party who has been compelled to pay the plaintiff's loss to

another who actually was at fault.'" *BCS Insurance*, 490 F.3d at 603 (quoting *Kerschner v. Weiss & Co.*, 667 N.E.2d 1351, 1355 (Ill. App. Ct. 1996)).

To prevail on a claim for implied indemnity, a plaintiff must establish: (1) that there was a pre-tort relationship between the indemnitor and the indemnitee; and (2) that the indemnitee was held derivatively liable for the acts of the indemnitor. *BCS Insurance*, 490 F.3d at 603 (citing *Kerschner*, 667 N.E.2d at 1356). Illinois courts have been cautious in defining the pre-tort relationship, limiting it to the following categories: lessor/lessee; employer/employee; owner/lessee; and master/servant. *Jordan*, at 772 (citing *Van Slambrouck v. Economy Baler Co.*, 475 N.E.2d 867, 870-71 (Ill. 1985)).[2]

In this case, the SAC does not allege a particular relationship between First American and the bank defendants. Plaintiff simply alleges that "First American had a preexisting relationship with Atlanta Fed and Citizens." SAC [48], ¶46. Although Plaintiff does allege that both it and RBS Citizens entered into agreements with the Federal Reserve System, *id.*, ¶47(A), this allegation alone does not establish any of the requisite categories accepted in Illinois as a basis for implying a duty to indemnify.

Nor can First American prove the second element of an implied indemnity claim. Implied indemnity is available in Illinois "only where the indemnitee is

---

[2] For example, in *Jordan*, the alleged pre-tort relationship was that of "wholesaler-retailer" and the court, noting that the relationship fit into none of the classic pre-tort relationship categories and emphasizing that "Illinois courts have generally refused to expand the set of qualifying pre-tort relationships," rejected the retailer's indemnification claim. *Jordan*, 83 F.Supp.3d at 773 (citing *Lohman v. Morris*, 497 N.E.2d 143, 146 (Ill. App. Ct. 1986); *Friedman, Alschuler & Sincere v. Arlington Structural Steel Co.*, 489 N.E.2d 308, 310 (Ill. App. Ct. 1985); *Allison v. Shell Oil Co.*, 495 N.E.2d 496, 498-504 (Ill. 1986)).

'liable [to the plaintiff] solely on a derivative basis.'" *Jordan*, F.Supp.3d at 773.

Indeed, the liability must be "wholly derivative, resulting solely out of the agent's actions." *BCS Insurance*, 490 F.3d at 603. "Stated differently, 'the party on whom the duty to indemnify is sought to be imposed must have been in some (though often an attenuated) sense 'at fault' and the other party blameless though liable–that is to say, only strictly liable, by virtue of respondeat superior, implied warranty, strict products liability, or some other legal principle that imposes liability regardless of fault.'" *Jordan*, 83 F. Supp. 3d at 773 (quoting *Jinwoong, Inc. v. Jinwoong, Inc.*, 310 F.3d 962, 965 (7th Cir. 2002)). First American, however, does not allege that it faces any potential liability that is in any way derivative.

For these reasons, the Court finds that First American's implied indemnification claim fails as a matter of law.

C.    Plaintiff's Claim for Restitution

In Count III, Plaintiff seeks restitution for payment by mistake under the Illinois Uniform Commercial Code, 810 ILCS 5/3-418. The Illinois UCC provision relating to restitution for payment or acceptance by mistake provides:

> (a) Except as provided in subsection (c), if the drawee of a draft pays or accepts the draft and the drawee acted on the mistaken belief that (i) payment of the draft had not been stopped under Section 4-403 or (ii) the signature of the drawer of the draft was authorized, the drawee may recover the amount of the draft from the person to whom or for whose benefit payment was made or, in the case of acceptance, may revoke the acceptance. . . .
>
> (b) Except as provided in subsection (c), if an instrument has been paid or accepted by mistake and the case is not covered by subsection (a), the person paying or accepting may, to the extent permitted by the law governing mistake and restitution, (i) recover the payment from the

person to whom or for whose benefit payment was made or (ii) in the case of acceptance, may revoke the acceptance. 810 ILCS 5/3-418(a), (b).

The statute further provides that the remedies provided therein "may not be asserted against a person who took the instrument in good faith and for value or who in good faith changed position in reliance on the payment or acceptance." 810 ILCS 5/3-418(c).

Plaintiff alleges that First American paid check No. 191435 to the Atlanta Fed, "as agent for Citizens and sub-agent for Goodson under 12 C.F.R. §210.6(a)(1)"; that, "[u]nder 810 ILCS 5/3-418(a), the Atlanta Fed was 'the person to whom . . . payment was made . . . .' by First American"; and that "[u]nder 810 ILCS 5/3-418(a), Citizens and Goodson were 'person[s] for whose benefit payment was made . . . .' by First American." SAC [48], ¶¶55-57. The SAC further alleges that, when First American paid check No. 191435, it did so upon the mistaken belief that the signature of the drawer of the check No. 191435, 1st Ayd, "was authorized." *Id.*, ¶58.

When dismissing the prior version of this claim, the Court noted that Plaintiff failed to allege that the bank defendants did not take the check in good faith and for value, and the claim therefore failed under 810 ILCS 5/3-418(c). In the SAC, Plaintiff has attempted to avoid this pitfall by alleging the following:

> Citizens did not take the item from Goodson in good faith because it did not observe reasonable commercial standards of fair dealing under 810 ILCS 5/3-103(a)(4). Citizens' failure to observe reasonable commercial standards of fair dealing is evidenced by, upon information and belief, its giving special, favored treatment to Goodson by taking this large, suspicious item for deposit and collection and then wiring the funds to Japan before the item was paid. Upon information and belief, Citizens consciously disregarded its own policies and procedures

> to assist Goodson, whom its branch employees knew and viewed as a good customer. These actions, upon information and belief, violated reasonable commercial standards of fairness in [] the banking industry because they favored one party in the collection chain (Goodson) to the detriment of another (First American).

SAC [48], ¶59. As to Goodson, First American alleges that "Goodson did not in good faith change position in reliance on the payment or acceptance" of electronic check No. 191435, because Goodson "directed Citizens to wire the finds to Japan before (and without knowledge of) First American's payment or acceptance of the item." *Id.*, ¶60.

As an initial matter, the SAC alleges no facts to support a claim under 418 against the Federal Reserve Bank of Atlanta, and the claim is dismissed as to this defendant. Additionally, purportedly giving preferential treatment to a known customer is not inconsistent with taking the check in good faith and for value. Indeed, First American alleges that defendant engaged in certain fraud detection protocols before wiring funds to Japan. Moreover, the SAC alleges that RBS Citizens and Goodson wired funds to Japan, and that allegation establishes that the defendants changed position in reliance on the payment or acceptance of the item.

The commentary to Section 3-418 of the Uniform Commercial Code is instructive here (this section is identical to the corresponding section in the Illinois UCC). Noting that a claim like the one First American is attempting to assert here is rarely successful, the commentary states as follows:

> Subsection (a) allows restitution in the two most common cases in which the problem is presented: payment or acceptance of forged checks and checks on which the drawer has stopped payment. If the drawee acted under a mistaken belief that the check was not forged or

had not been stopped, the drawee is entitled to recover the funds paid or to revoke the acceptance whether or not the drawee acted negligently. But in each case, by virtue of subsection (c), the drawee loses the remedy if the person receiving payment or acceptance was a person who took the check in good faith and for value or who in good faith changed position in reliance on the payment or acceptance. Subsections (a) and (c) are consistent with former Section 3-418 and the rule of Price v. Neal. The result in the two cases covered by subsection (a) is that the drawee in most cases will not have a remedy against the person paid because there is usually a person who took the check in good faith and for value or who in good faith changed position in reliance on the payment or acceptance.

§ 3-418, Payment or Acceptance by Mistake, Uniform Commercial Code § 3-418.

Based upon the allegations of the SAC, this case falls within the usual scenario: RBS Citizens accepted and paid the forged check in good faith and for value and in good faith changed position in reliance on the payment or acceptance. The Court could find no case (and First American has cited none) where a restitution claim was allowed under circumstances similar to those presented here. Nor has any case been cited suggesting that Goodson's directions to Citizens RBS Citizens would be sufficient to establish that he failed to take the instrument in good faith and for value, or failed in good faith to change position in reliance on the payment or acceptance. The same is true with respect to the bank defendants: the Court is not aware of any precedent to support the notion that the alleged conduct establishes a failure to take in good faith and for value, or that what happened here was not a good faith change in position in reliance on payment or acceptance. Plaintiff's allegations concerning good faith are threadbare recitals of the elements of the claim, and, as such, are not enough to defeat the well-taken motion to dismiss. As such, this claim is dismissed as to the bank defendants and Goodson.

Additionally, as before, the Federal Reserve Board's Regulation J expressly limits a Reserve Bank's liability. Imposing liability on the bank defendants under the facts alleged here would conflict with those limits (as discussed above). "Where state and federal law 'directly conflict,' state law must give way." *Hillman v. Maretta*, 133 S.Ct. 1943, 1955 (2013)(quoting *PLIVA, Inc. v. Mensing*, 131 S.Ct. 2567, 2577, 180 L.Ed.2d 580 (2011); *Wyeth v. Levine*, 555 U.S. 555, 583 (2009)). Accordingly, the claim is dismissed as to the bank defendants for this additional reason as well.

D.  Plaintiffs' Negligent Spoliation Claim

In Count IV of the SAC, Plaintiff alleges negligent spoliation of evidence against RBS Citizens. Plaintiff alleges that RBS Citizens destroyed check No. 191435 when it knew that the check was drawn on First American, and it knew or should have known that the check was part of a fraudulent scheme to steal funds on account at First American. Amended Complaint [6], ¶45. "A spoliation plaintiff is required to prove the elements of negligence, including that: (1) the spoliation defendant owed the plaintiff a duty to preserve the evidence; (2) the spoliation defendant breached the duty by failing to preserve the evidence; (3) the loss of the evidence proximately caused the spoliation plaintiff to be unable to prove an underlying lawsuit; and (4) the spoliation plaintiff suffered damages." *Jones v. UPR Products, Inc.*, No. 14 C 1248, 2015 WL 3463367, at * 3 (N.D. Ill. May 29, 2015)(citing *Martin v. Keeley & Sons, Inc.*, 979 N.E.2d 22, 27 (Ill. App. Ct. 2012).

"A claim of spoliation of evidence is connected to the merits of the underlying suit." *Borsellino v. Goldman Sachs Group, Inc.*, 477 F.3d 502, 510 (7th Cir. 2007) (citing *Gawley v. Ind. Univ.*, 276 F.3d 301, 316 (7th Cir. 2001)). "If a plaintiff cannot prevail in the underlying suit even with the allegedly lost or destroyed evidence, then a claim for spoliation will fail because the plaintiff cannot prove damages." *Id.* Based upon the record in this case, as explained above, Plaintiff's Regulation J claim fails because it has not, and cannot, show that the defendants inaccurately represented the original check; its implied indemnification claim fails because it has not, and cannot, establish the existence of a pre-tort relationship or that it faces any potential liability that is in any way derivative; and its restitution claim fails because it has not, and cannot, establish that the defendants failed to take check No. 191435 in good faith and for value. In light of this analysis, Plaintiff's spoliation claim fails as well, as Plaintiff cannot show that the loss of the original check prevents it from proving any of its claims.

E.     Plaintiff's Professional Negligence Claim against Goodson

In Count V of the SAC, Plaintiff alleges that Goodson had a duty to act with reasonable professional care in handling check No. 191435 and the proceeds thereof as client funds; that he breached this duty by transacting check No. 191435 for deposit "notwithstanding facial irregularities on the check and surrounding circumstances reasonably suggesting that the check was fraudulent"; and that, as a result, Plaintiff has been damaged. SAC [48], ¶¶69-71.

Goodson argues that Plaintiff's professional negligence claim must be dismissed because Plaintiff has not alleged the existence of an attorney-client relationship between Goodson and Plaintiff; nor, he argues, does Plaintiff allege that he owed any duty to 1st Ayd Corporation. Plaintiff argues that the duty arose not because of any attorney-client relationship, but rather because of the check's facially-apparent suspiciousness.

To state a professional negligence claim under Illinois law, a plaintiff must allege "(1) the existence of a professional relationship, (2) a breach of duty arising from that relationship, (3) causation, and (4) damages." *Hassebrock v. Bernhoft*, No. 10-CV-679-JPG-DGW, 2014 WL 1758884, at *6 (S.D. Ill. May 2, 2014)(quoting *SK Partners I, LP v. Metro Consultants, Inc.*, 944 N.E.2d 414, 416 (Ill. App. Ct. 2011)); *Pelham v. Griesheimer*, 440 N.E.2d 96, 99 (Ill. 1982). An attorney "owes a duty to a third party only where hired by the client specifically for the purpose of benefitting the third party." *Hassebrock*, 2014 WL 1758884, at *6 (quoting *Kopka v. Kamensky & Rubenstein*, 821 N.E.2d 719, 723 (Ill. App. Ct. 2004)). "To survive a motion to dismiss, the non-client third party must allege 'that the primary intent of the client was for the professional services to benefit or influence the third party.'" *Id.* (quoting *Kopka*, 821 N.E.2d at 723-24). First American does not allege that Goodson's client had any intent to benefit or influence 1st Ayd. On the contrary, the SAC alleges that the client's intent was to defraud 1st Ayd. Based upon the allegations the Court cannot infer from this record that Goodson owed any duty to

1ˢᵗ Ayd or First American. Accordingly, First American's professional negligence claim fails.

Plaintiff's argument that Goodson owed a duty because he saw the check and should have known it was suspicious is inconsistent with the law in Illinois, which, as explained, requires an attorney-client relationship before imposing any duty. Additionally, under this theory, Plaintiff might have a claim against anyone who came into contact with the check, unreasonably expanding the scope of a professional negligence claim in Illinois.

Conclusion

For the reasons explained above, the bank defendants' motion to dismiss [52] and Goodson's motion to dismiss [57] are both granted. Plaintiff's Second Amended Complaint is dismissed with prejudice.

Dated: December 22, 2015                    ENTERED:

J(                              United States District Judge